313 S.E.2d 436

**WEST VIRGINIA DEPARTMENT OF CORRECTIONS**

v.

**Hughie LEMASTERS, West Virginia Civil Service Commission.**

**No. 15968.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1984.

Decided March 2, 1984.

Timothy F. Cogan, O'Brien, Cassidy & Gallagher, Wheeling, for appellees.

Chauncey H. Browning, Atty. Gen., Dana D. Davis, Asst. Atty. Gen., Charleston, for appellant.

NEELY, Justice:

This is an appeal by the Department of Corrections (the Department) from an order of the West Virginia Civil Service Commission (the Commission) which overturned the dismissal of Hughie Lemasters, an employee of the Department of Corrections. The Department had dismissed Mr. Lemasters because he had either sold or given fire arms to a former inmate on the day of that inmate's release. The Commission ruled that this sanction was excessive and instead imposed a three-month suspension. The Department appeals claiming that the Commission erred in its reading of the law and in its application of the standard of review. We agree and reverse the Commission's ruling.[1]

I

Mack Coleman, also known as Snuffy Red, was released from the West Virginia Penitentiary at Moundsville on 13 September 1982, at approximately 8 a.m. Mr. Coleman was released because the Circuit Court of Marshall County had declared his sentence null and void and Boone County authorities had not held a retrial within ninety days. Until his release, Coleman had been serving a life sentence as a habitual criminal since 21 May 1959. His record indicates three prior convictions for armed robbery or attempted armed robbery as well as numerous other charges including

breaking and entering, drinking in public and cattle stealing.

On 14 September 1982, at 3:30 a.m., less than twenty-four hours after his release from Moundsville, Mr. Coleman was arrested by Deputy George Paugh of the Marshall County Sheriff's Department on charges of possession of deadly weapons and public intoxication. During an interview conducted on 15 September 1982, Coleman stated that he had purchased a .410 shotgun and a .38 police special from Hughie Lemasters for $250 on the night he was released from the Moundsville Penitentiary.

On 14 September 1982, Mr. Lemasters received a letter from Donald E. Bordenkircher, the warden at Moundsville, suspending him without pay from his duties pending an investigation of the charge that he had sold guns to Mack Coleman. On 22 September 1982, Bordenkircher again wrote Lemasters informing him that as of that date Lemasters was dismissed from his duties as a building maintenance supervisor pursuant to Section 13.02 of the Rules and Regulations of the West Virginia Civil Service Commission. The letter continued to state that Lemasters had been found guilty of gross misconduct because: (1) he had violated a prison employee regulation requiring that employees not correspond with prisoners, ex-prisoners or their families, and which explicitly stated that a violation of this rule would result in dismissal; and, (2) he had either sold or given a .410 shotgun and a .38 revolver to a former inmate.

In deciding to dismiss Mr. Lemasters, the Department was heavily influenced by the testimony of Mrs. Janet Lasson. Mrs. Lasson had accompanied Mr. Coleman to the Lemasters' home that night. She had agreed to drive Mr. Coleman to where he wanted to go for a small fee. Mrs. Lasson corroborated Mr. Coleman's statement that Lemasters had given guns to the former prisoner. Mrs. Lasson did not know either

1. The Department also alleges as error the Commission's denial of the Department's motion for reconsideration. Because of our disposition of the first issue, we need not address this second issue.

Coleman or Lemasters before the night of 14 September.

Mr. Lemasters appealed his dismissal to the Civil Service Commission and hearings were held on 1 February 1983, and 23 March 1983. In addition to the testimony taken at those hearings, the Commission also considered a deposition of Mr. Lemasters who was too ill to attend the hearings. The Commission issued an order on 3 June 1983. That order required the Department to reinstate Mr. Lemasters and reduced the sanction imposed on him to a three-month suspension. In reaching this determination, the Commission explicitly stated that it believed Mr. Lemasters had in fact either given or sold guns to a former inmate, but that dismissal was nevertheless inappropriate because this was not in violation of federal or state law.

## II

■ It is perhaps necessary to start with first principles. Although it is true that the Civil Service system was established in part to assure state employees of some job security, that purpose is best viewed as a means to the desirable end of attracting competent, principled, and dedicated individuals into public service. *W. Va. Code* 29–6–1 [1977], the preamble to the Civil Service chapter, states this explicitly:

> The general purpose of this article is to attract to the service of this state personnel of the highest ability and integrity by the establishment of a system of personnel administration based on merit principle and scientific methods governing the appointment, promotion, transfer, layoff, removal, ... and other incidents of state employment.

As one method of attracting such qualified individuals, the system assures through *W. Va. Code* 29–6–10(11) [1977] and 29–6–15 [1977] that employees who have completed their probationary period may be dismissed only for "good cause."

■ It is well established law in this state that "good cause" requires the state employer to demonstrate more than a technical violation of a statute or regulation. The ultimate sanction of dismissal is appro-

priate only in cases where the employee's wrong was of a substantial nature and directly affected the rights and interests of the public. *Guine v. Civil Service Commission*, 149 W.Va. 461, 141 S.E.2d 364 (1965); *City of Logan v. Dingess*, 161 W.Va. 377, 242 S.E.2d 473 (1978). As recently as 1980, this court held: "*W. Va. Code* 29–6–15, requires that dismissal of a civil service employee be for good cause, which means misconduct of a substantial nature directly affecting the rights and interest of the public, rather than upon trivial or inconsequential matters or mere technical violations of statute or official duty without wrongful intention." Syl. Pt. 1, *Oakes v. West Virginia Department of Finance and Administration*, 164 W.Va. 384, 264 S.E.2d 151 (1980).

■ Although it is true that dismissal is inappropriate when the employee's violation is found to be merely a technical one, it is also true that seriously wrongful conduct can lead to dismissal even if it is not a technical violation of any statute. In Syllabus Point 3 of *Thurmond v. Steele*, 159 W.Va. 630, 225 S.E.2d 210 (1976) we stated: "The employing authority's right to dismiss a Civil Service protected employee for gross misconduct is not conditioned upon or limited by the outcome of any criminal charges which may have been brought against the employee." Therefore, the Commission was wrong in this case in assuming that dismissal was inappropriate in a case where the employee's misconduct, though serious, was not in technical violation of any state or federal statute. The test is not whether the conduct breaks a specific law, but rather whether it is potentially damaging to the rights and interests of the public.

■ It is also worth noting that the fact that Lemaster's conduct is alleged to have occurred while he was off duty is of no legal significance. In Syl. Pt. 2 of *Thurmond, supra,* we also stated:

> If the employing authority dismisses or otherwise disciplines a Civil Service protected employee for gross misconduct occurring off the job and not involving state property, such misconduct must be

substantial and not frivolous, trivial or inconsequential, and it must be shown that such misconduct reflects adversely upon the employee's ability to perform his job, impairs the efficient operation of the employing authority and bears a substantial relationship to duties directly affecting the rights and interests of the public.

The question before this court, then, is whether Mr. Lemasters' conduct can be seen as adversely affecting his ability to perform his job, or in any substantial way damaging interests of the Department of Corrections and the public at large.

■ The Commission's finding of fact was that Mr. Lemasters had either sold or given firearms to a recently released habitual felon. Because findings of fact made by the Commission will not be reversed by this court unless they are clearly wrong, *Brown v. Civil Service Commission*, 155 W.Va. 657, 186 S.E.2d 840 (1972); *Vosburg v. Civil Service Commission*, 166 W.Va. 488, 275 S.E.2d 640 (1981), this factual determination must be accepted by this court. Thus, the issue before us is a simple one. Does giving guns to recently released habitual felons damage the interests of the public? Based on the facts of this case, we do not consider that question to be a difficult one.

■ Mr. Coleman had a long history of violent crimes. The fact that his first order of business upon release from prison was an attempt to purchase firearms gives one little cause to believe that he had mended his ways. The additional fact that within hours of having obtained those guns from a state employee he was arrested for intoxication makes the danger to public interests and safety even more immediate. If Mr. Lemasters had been guilty only of fraternizing with a former inmate in violation of prison employee regulations, that technical violation might not have warranted dismissal. But such is not the case before us. The problem is not simply that Mr. Lemaster violated a particular rule by aiding and abetting a felon in gaining possession of a firearm in violation of the law; the problem is that Mr. Lemasters' conduct showed a gross disregard for his professional responsibilities and for the public safety.

We hold that the Civil Service Commission's order in this case is clearly wrong. It is wrong because the violation of a particular state statute is not a *sine qua non* for dismissal of a civil service employee. It is also wrong because of the Commission's ambivalent approach to the evidence. The Commission noted that the hearing had turned into a swearing contest between witnesses. Although the Commission ultimately found the testimony of Mrs. Lasson most credible because of her demeanor and because she was a disinterested party, they nevertheless noted some uncertainty about this decision. Thus, in an apparent effort to strike a compromise, they ruled that the gross misconduct that, as a factual matter, they had found to occur did not merit dismissal primarily because they were not sufficiently certain that it had happened.

We have read the record and are persuaded that the sale of firearms occurred. It is impossible to have "sort of" sold guns to dangerous felons. Either Mr. Lemasters engaged in that act or he did not. Because the Commission found that he did, and we find that their finding is correct, they should have recognized that conduct as sufficiently serious to merit dismissal. Solomon is widely viewed as the model of judicial wisdom because he recognized that suggesting cutting the baby in half would lead the parties to reveal the truth. His wisdom would have been called into question, however, if he had gone through with the act. The Commission's order in this case appears to have been an actual attempt to split the baby in half.

Therefore, for the reasons given above we reverse the order of the Commission and rule that Mr. Lemasters should be dismissed.

Reversed.